MARYLAND CASUALTY COMPANY,
a corporation, Plaintiff,

v.

Mrs. Hildegarde MATHEWS, Vernie Williams, Mrs. Opal Kiefer, Grover T. Davis, Jr., Herbert Margon, Millard Wallace, John D. Warfield, William Markham, Mrs. Mary Kathleen McIntyre, William A. Ballard, The Charleston National Bank, a National Banking Association, and Kanawha City Savings & Loan Company, a corporation, Defendants.

Civ. A. No. 2598.

United States District Court
S. D. West Virginia,
Charleston Division.

Oct. 12, 1962.

W. T. O'Farrell, Charleston, W. Va., for plaintiff, Maryland Cas. Co.

George S. Sharp, Charleston, W. Va., for defendant, Mrs. Hildegarde Mathews.

Bernard D. Horan, Charleston, W. V., for defendant, Vernie Williams.

Herman D. Rollins, Charleston, W. Va., for defendant, Mrs. Opal Kiefer.

Chauncey H. Browning, Jr., Charleston, W. Va., for defendant, Grover T. Davis, Jr.

W. Hayes Pettry, Charleston, W. Va., for defendant, Millard Wallace.

Arch J. Alexander, Jr., Marmet, W. Va., for defendant, William Markham.

Howard R. Klostermeyer, Charleston, W. Va., for defendant, Mrs. Mary Kathleen McIntyre.

McClintic, James, Wise & Robinson, Charleston, W. Va., for defendant, The Charleston National Bank.

Wayne A. Rich, Charleston, W. Va., for defendant, Kanawha City Savings & Loan Co.

FIELD, Chief Judge.

In this interpleader action, one of the defendants, Grover T. Davis, Jr., has filed a motion to dismiss the complaint alleging that this Court does not have jurisdiction over the subject matter thereof.

This controversy involves the distribution of a reward which was offered relative to a robbery which occurred in one of

the buildings of the State Capitol of West Virginia. On or about June 20, 1960, the offices of the Department of Motor Vehicles were entered and approximately $360,000.00 was stolen therefrom. On June 23, 1960, the plaintiff, Maryland Casualty Company, a corporation, the insurer of a portion of the loss, made a public offer of a reward for information leading to the arrest and conviction of the person or persons who perpetrated this theft. The public offer of the reward specifically provided as follows:

"The final determination as to what person or persons shall be eligible to receive part or all of this reward shall be left to a board of prominent citizens to be named by the Maryland Casualty Company of Baltimore, Maryland. The maximum amount of reward if all monies recovered would be $35,000.00."

On July 8, 1960, Earl Hayes Mathews was arrested for the crime and thereafter in the Intermediate Court of Kanawha County, West Virginia, entered a plea of guilty to the charge and was sentenced to a term of imprisonment in the State penitentiary. There being a number of claimants to the reward money, Maryland Casualty Company duly appointed three citizens of Charleston, West Virginia, Clarence J. Benson, T. D. Kauffelt and V. V. Faigley, as the "board of prominent citizens" specified in the notice of the reward offer. Thereafter this board published a notice in the local newspapers to the effect that any claimant to the reward should file a written claim with the board. Ten claimants, all of whom are defendants to this bill of interpleader, filed such written claims and were thereafter notified of a hearing to be held for the purpose of determining what person or persons might be eligible to receive part or all of the reward. This hearing was held at the State Capitol on June 23, 1961, on which date all of the claimants appeared either in person or by their attorneys.

Following this hearing the board reached the determination that the reward money should be distributed as follows:

To Mrs. Hildegarde Mathews the sum of $5,000.00; to Mrs. Mary Kathleen McIntyre $10,000.00; and to Grover T. Davis, Jr., the residue thereof amounting to $19,540.58.

Notification of the procedure followed by the board and its determination was set forth in a letter to the offerer, Maryland Casualty Company, under date of July 10, 1961.

Understandably, the unsuccessful claimants to the reward were dissatisfied with the determination of the board, and one of them, Mrs. Opal Kieffer, instituted an action against Maryland Casualty Company seeking recovery thereof. In the face of this and similar claims, Maryland Casualty Company filed this bill of interpleader. Several of the defendant-claimants have filed answers herein accepting or acknowledging the jurisdiction of this Court over the subject matter and asking that the entire controversy be heard *de novo*. The defendant McIntyre in her answer challenges the eligibility of the defendant Grover T. Davis, Jr., as a recipient of any part of the reward and asks that this Court determine only that particular issue. The defendant Davis in his motion to dismiss takes the position that the action of the board constituted a final determination of the rights and claims of all of the parties which should preclude this Court from taking jurisdiction.

Concededly, an offerer of a reward such as that under consideration has the right to attach such conditions as he sees fit, including a provision that he or other persons shall be the final judges of any disputes relative to the reward and, under such circumstances, that decision, in the absence of fraud, is conclusive. The rights of parties to the reward money rest exclusively in the domain of the law of contracts and the defendants, as offerees, necessarily accept the reward offer subject to the terms and conditions set forth in the offer. In this case there is no allegation of fraud or impropriety

directed toward the members of the citizens' board and the record indicates that the members of the board exercised great care to discharge their responsibilities in a fair, conscientious and proper manner.

If no further question was involved it would appear that the motion to dismiss should be granted. However, at least two of the defendants in their answers challenge the eligibility of the defendant Davis to share in the reward, charging that during the period involved he was officially employed as an investigator of crime by the prosecuting attorney of Kanawha County and that, accordingly, any reward to him contravenes public policy. It was the opinion of this Court that if, in fact, the nature of Davis' official employment placed him in such a position that an award to him would be contrary to public policy, this Court should not countenance such an award either by affirmative order or by declining to entertain this proceeding. Accordingly, it was ordered that evidence be taken for the purpose of developing the circumstances, duties and responsibilities of Davis' employment by the prosecuting attorney necessary to a determination of his posture as a recipient of the reward.

The evidence shows that in August, 1959, Davis was employed by Charles M. Walker, the prosecuting attorney of Kanawha County, West Virginia, in the capacity of an investigator. This employment was pursuant to the authority of Chapter 7, Article 4, Section 2, Code of West Virginia, which provides in part as follows:

"The prosecuting attorney of any county, with the approval of the county court, or of the governor, or of the court of the county vested with authority to try criminal offenses, * * * may, within his discretion, offer rewards for the apprehension of persons charged with crime, or may expend money for the detection of crime. * * * Provided, however, that nothing herein shall permit or give to the prosecuting attorney of any county, having a population according to the last official census of sixty thousand or less, the right to appoint a full-time investigator or detector of crime * * *."

Prior to his employment by the prosecuting attorney, Davis had been chief of police of the Town of St. Albans, and his employment by the prosecutor was a full-time position. Walker testified that Davis' duties were to follow up leads that came to the office, make independent investigations, cooperate with the various police organizations in the County, including the state police, and to represent the prosecutor in the investigation of serious crimes, such as homicides " * * and generally just represent my office in connection with the investigation of crimes in the county." Under the terms of his employment by Walker, Davis' formal hours of office duty were from 9:00 A.M. until 4:30 P.M. Under some circumstances, however, he was required to work at other hours including Saturdays and Sundays. Quite often, Davis' investigation services were made pursuant to a specific assignment by Walker, or one of his assistants.

Following the Statehouse robbery, an investigating team of state policemen was formed for the purpose of solving the crime and they were in contact with Walker's office from time to time. Information from various citizens relative to possible suspects was given to the prosecutor's office during the period of the investigation. Walker was under the impression that information received by his office was passed along to the state police investigating team. It was further his testimony that there was a reciprocal interchange of information between the investigating team and his office. The crime having been committed in Kanawha County, had Mathews not entered a plea of guilty, he, of course, would have been tried in the Intermediate Court of this County. Walker was requested to assign Davis to work full time as a member of the investigating team, but declined to make such an assignment

for the reason he could not spare Davis full time for that purpose and the understanding between Walker and the investigating authorities "was that I would just keep in touch with them just as in any other crime, and if they needed him they would let me know." In this connection Walker was asked whether if Davis had received any information which would lead him to believe that he knew who had committed a felony such as the Statehouse robbery, his duty as an investigator in Walker's office would require that he pass that information on to persons charged with the primary investigation. To this question Walker responded, "I would think so or else to advise me or one of my assistants of the information that he had, and perhaps he might want us to judge whether it should be passed on or not. I considered Mr. Davis sort of my eyes and ears in the county."

In regard to his work relative to the Statehouse robbery, Davis testified that on Monday, June 20, 1960, Mr. Walker sent him to the city police station to obtain the particulars of the robbery. On the same day he went to the State office building and looked at the vault which had been rifled. He testified that thereafter his investigatory work on the robbery was conducted either after working hours or during his noon hour. He stated that for the most part he merely listened to street conversation which he characterized as "gossip," read the newspapers and "pieced the information together." He did state that on one occasion he received a telephone call from the Chief of Police of St. Albans indicating the possibility that unnamed individuals in the Marmet area might be involved in the case and that on one occasion he visited the Town of Marmet. On June 28, he gave his assembled information to Lieutenant Roush who was in charge of the official investigating team. Primarily this information was that he considered Mathews as the perpetrator of the crime. On July 8, 1960, the day of Mathews'

arrest, Davis went to the state police headquarters in South Charleston and watched them take the money from the trunk of Mathews' automobile. Davis testified emphatically that the work which he did toward the solution of the Statehouse robbery was done on his own time without assignment from the prosecuting attorney's office and was performed with the intention of solving the crime for the purpose of collecting the reward.

■ The principle is well settled on considerations of public policy that an officer cannot lawfully claim a reward for the performance of a service which it was his duty to discharge.[1] Prior to the turn of the century this principle was stated by Mr. Justice White in United States v. Matthews, 173 U.S. 381 at 384, 19 S.Ct. 413 at 414:

> "It is undoubted that both in England and in this country it has been held that it is contrary to public policy to enforce in a court of law, in favor of a public officer, whose duty by a virtue of his employment required the doing of a particular act, any agreement or contract made by the officer with a *private individual*, stipulating that the officer should receive an extra compensation or reward for the doing of such act. An agreement of this character was considered at common law to be a species of quasi extortion, and partaking of the character of a bribe."

This principle was recognized by our Supreme Court of Appeals of West Virginia in the case of Ferrell v. Compensation Com'r., 114 W.Va. 555, at 556, 172 S.E. 609 at 610, wherein the Court stated:

> "It is general law that where a public peace officer, within his territorial jurisdiction, undertakes to discharge a duty which comes within the purview of his office, he is presumed to act in his official capacity. Bank v. Edmund, 76 Ohio St. 396, 81 N.E. 641; 11 L.R.A.(N.S.) 1170,

---

1. 77 C.J.S. Rewards § 36, p. 381; 46 Am.Jur., "Rewards," § 17, p. 114.

10 Ann.Cas. 726. For his services in such connection he may have recompense only as fixed by law. A promise of a third person, whether individual or corporate, to remunerate him for such services is against public policy and cannot be enforced."

Counsel for Davis concedes this basic principle of the common law but contends that Davis is entitled to share in the reward for the reason that the acts or services performed by him in this case were not within the scope of his official duties. He contends that the evidence indicates that the area of Davis' official duties was limited to those criminal investigations to which he was specifically assigned by the prosecuting attorney's office and that in the absence of such an assignment any activities performed outside of his specified working hours would not come within the scope of his official responsibilities. The record in this case does not support Davis' limited concept of the scope of his official duties and responsibilities as an investigator of the prosecuting attorney's office. Chapter 7, Article 4, Section 1, of the Code of West Virginia places upon the prosecuting attorney the duty to attend to the criminal business of the State in his County and provides that " * * * Every public officer shall give him information of the violation of any penal law committed in his county." Section 2 of Article 4, authorizes the prosecuting attorney in a populous county such as Kanawha to appoint a "full-time investigator or detector of crime." The obvious purpose of this statute was to provide assistance to the prosecuting attorney looking toward the efficient discharge of his duty with respect to the criminal business of the state in such county. Discussing this statute in another context, the Supreme Court of Appeals of West Virginia in Singleton v. County Court, 84 W.Va. 691, at 694, 100 S.E. 548 at 549, stated:

"The discovery of the crime and the criminal was the chief inducement for the enactment."

In the light of the statutory objectives, I can only conclude that in the area of the investigation and detection of crime, the scope of Davis' duties and responsibilities was coextensive with that of the prosecuting attorney in Kanawha County. The fact that as a matter of administrative procedure the greater portion of his investigations were specific assignments from Walker does not militate against this conclusion.

If, in fact, crimes such as the Statehouse robbery were within the general scope of Davis' duties and responsibilities, the fact that he was not specifically assigned to that investigation or that his information was obtained and developed after formal working hours does not improve his posture in this case. In the landmark case of Somerset Bank v. Edmund, 76 Ohio St. 396, 81 N.E. 641, it was sought to remove the case from the impact of this public policy on the theory that the constable-plaintiff therein had made an arrest without a formal warrant and therefore was acting not in his official character, but as a private citizen and, accordingly, he should be entitled to an offered reward. The Court refused to recognize this finespun distinction, stating; 81 N.E. at page 643:

" * * *. Whether, then, a constable arrests a person upon a warrant duly issued, or, pursuant to the authority vested in him by virtue of his office, as a conservator of the peace, arrests without a warrant, in either case, he is but performing his sworn duty as a public officer, and will be held to have acted in his official capacity. And both public policy and sound morals forbid that he should be permitted to demand or receive for the performance of a purely legal duty any fee or reward other than that established and allowed by law as compensation for the services rendered."

The principle enunciated in the Somerset case was recognized and followed in Gray v. Martino, 91 N.J.Law 462, 103 A. 24. In that case the plaintiff seeking the

reward occupied the position of special police officer in Atlantic City and was identified with the work of the prosecutor of that County. In holding adversely to the plaintiff the Court stated:

"The testimony makes it manifest that he was a special police officer to some extent identified with the work of the prosecutor's office, and that position upon well-settled grounds of public policy required him to assist at least, in the prosecution of offenders against the law. * * *

"The services he rendered in this instance must be presumed to have been rendered in pursuance of that public duty, and for its performance he was not entitled to receive a special quid pro quo."

In the case of In the Matter of Russell, 51 Conn. 577, certain police officers sought to recover a reward. The information given by the policemen which was the basis for their claim was obtained by them during hours allotted to them for resting or on days allowed for recreation. The Court concluded that they could not recover this reward and made the following observations:

" * * *. For although they performed the service for which the reward was offered at times given them for rest or recreation, they were nevertheless policemen of the city, and as such were drawing pay from the city treasury, for the whole time, at the rate of one thousand dollars per annum. They were not bound to perform the service during those times, because they were excused from the performance of any official duty on all such occasions unless thereto required by the chief of police; but the service performed was in the line of policemen's duty, and having volunteered to perform it, they cannot be permitted to say that they did so as private individuals, but must be deemed to have acted as policemen of the city in as-

sisting the ministers of the law upon whom the duty specially devolved.

* * * * * *

"If the law were otherwise, and especially if it were as the claimants . in the present case seem to suppose, any police officer of a city, who, while 'off duty,' should discover an incendiary setting fire to a building, or a burglar breaking and entering a dwelling house, or any wicked and evil disposed person committing a felony of any other kind within the city limits, would be entitled to demand and recover a reward, if one had been previously offered by the city or by individuals, for the apprehension of the felons, or for information which would lead to their apprehension, or to their detection and conviction, on complying with the conditions of the reward, notwithstanding the compensation paid to such officer from the city treasury for the performance of his official duties. And upon the same principle a policeman might, without breach of official duty, withhold from his superior officers the information so obtained because it was obtained while he was 'off duty,' and might thus shield criminals of the worst description from prosecution and punishment. Such a principle cannot receive the sanction of a court of justice."

This particular question has never been presented to our own Supreme Court of Appeals but the principle enunciated in Somerset and Russell was recognized and followed by the Supreme Court of Virginia in Buek v. Nance, 112 Va. 28, 70 S.E. 515.

The testimony of Davis, himself, demonstrates the wisdom of this principle of public policy and its appropriate application in a case such as this. At one point his testimony was as follows:

"Q. During the time that you were conducting this investigation of the Statehouse robbery on your own time was it your duty to turn over

such information as you received as a result of that work to Mr. Walker or to the official investigating team in your capacity as investigator for the prosecuting attorney's office?

"A. No, sir, it was not.

"THE COURT: Whom would you have turned it over to, Mr. Davis?

"THE WITNESS: As I received the information that I was working on, was to the board for the reward.

"THE COURT: Now, you say that you did this work in the evening and at night and on at least one occasion in the noon hour. Information that you developed during that period of time, you say that it was not your duty to furnish that information to Mr. Walker or anyone in the prosecuting attorney's office? Did I understand you correctly?

"THE WITNESS: That's correct.

"THE COURT: Whom did you turn it over to?

"THE WITNESS: I didn't turn it over to anyone until I put the puzzle together on my own time.

"THE COURT: And then whom did you turn it over to?

"THE WITNESS: Turned it over to Lieutenant Roush and Sergeant Jones of the Charleston Police Department at the Statehouse.

"THE COURT: They were on this so-called team?

"THE WITNESS: Yes, sir.

"THE COURT: But it was not, as you phrased it, until you had put the puzzle together, the fragmentary information that was ultimately a part of the puzzle?

"THE WITNESS: Yes, sir.

"THE COURT: You did not divulge that to anyone?

"THE WITNESS: No, sir."

■ Here the witness employed as a full-time investigator of crime in the County, states that he recognized no duty whatever to turn over to the prosecuting attorney or the official investigating team any information that he might have received or developed on his own time until he had "put the puzzle together" in order that he might qualify for the reward. He apparently was completely indifferent to the fact that such information might be utilized by the investigating authorities to solve or expedite the solution of the crime and recover the money for the State. Such an attitude on the part of public officers charged with the duty of detecting or investigating crime would be highly disruptive and represents the very type of conduct to which the court referred and refused to countenance in the Russell case, and sound public policy likewise demands that it not receive the sanction of this court. Accordingly, I find that by reason of his employment by the prosecuting attorney of Kanawha County as an investigator of crime Davis is ineligible to participate in the reward and his motion to dismiss must be denied.

In view of Davis' ineligibility to share in the reward, the remaining question is whether this court should hear the entire controversy *de novo* or should attempt to adopt in some degree the determination of the board of citizens. I am of the opinion that under the circumstances the entire matter must be heard *de novo*. The board determined that Davis should be the principal recipient, and with him eliminated from consideration, it would be impossible for this court to make any intelligent or equitable distribution of the fund on the record as it now stands. The plaintiff, the offerer of the reward, has seen fit to place this matter before this forum and all of the claimants to the reward are parties to this proceeding. Having taken jurisdiction of the subject matter, the interests of justice would best be served by a complete hearing of all of the parties on the merits looking toward final determination and disposition of this controversy. Counsel will prepare an appropriate order incorporating this opinion by reference therein.